UNITED STATES of America,
Plaintiff–Appellee,

v.

Larry A. OSUM, Defendant–Appellant.

No. 91–3299
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Sept. 25, 1991.

Joseph C. Bartels, Mark D. Kuss, New Orleans, La., for defendant-appellant.

Harry W. McSherry, Jr., Peter G. Strasser, John O. Braud, Asst. U.S. Attys., and Harry Rosenberg, U.S. Atty., New Orleans, La., for U.S.

Before GARWOOD, HIGGINBOTHAM
and BARKSDALE, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Larry A. Osum
(Osum) was convicted, following a jury tri-
al, of conspiring to commit mail fraud, in
violation of 18 U.S.C. § 371, and of six
substantive mail fraud counts under 18
U.S.C. § 1341. He brings this appeal chal-
lenging (1) the transfer of his case to a
different judge upon the government's mo-
tion, (2) the admission of evidence concern-
ing subsequent uncharged offenses, (3) the
sufficiency of the evidence, and (4) the ad-
mission of summary evidence under Feder-
al Rule of Evidence 1006. We affirm.

### Facts and Proceedings Below

Viewed most favorably to the govern-
ment, the evidence reflected the following.

Osum was employed as a bus driver for
the Regional Transit Authority (RTA) in
New Orleans. On July 19, 1985, Osum was
driving his bus in the median lane of Canal
Street when an automobile on his right
began to make a left turn. The two ve-
hicles merged together, the front bumper
of the car making light contact with the
front right door of the bus. Osum told the
other driver immediately after the collision
that he was not hurt. Osum had the re-
sponsibility under RTA policy to fill out an
accident report and to indicate therein if
any passengers or pedestrians were claim-
ing injuries from the accident. Osum did
not list anyone as having been injured.
When the RTA claims adjuster interviewed
Osum about two weeks after the accident,
Osum stated that the jolt from the collision
had not been strong enough to knock any-
one from their seats, and that no passen-
gers had complained of injury.

Shortly after the accident, Isaac Joshua
(Joshua), another RTA bus driver, ap-
proached Osum and told him that an attor-
ney for whom Joshua worked would file a
claim and obtain money for Osum. Joshua
also told him that he had two persons—his
niece and nephew, Myrna and Earl Dani-
els—whom he wanted to "appoint to the
accident" if Osum would vouch that they
had been passengers on the bus. Osum
agreed, and the following day he met in
Joshua's attorney's office with Joshua, the
attorney, and the two Danielses. Osum
told the Danielses where and how the acci-
dent had occurred. The attorney, Allen
Katz (Katz), directed them to a Dr. John
Lindner for treatment and paid Joshua
$500 for producing Osum and the Daniels-
es.

Subsequently, Osum, Myrna Daniels, and
Earl Daniels filed claims with the General
Accident Insurance Company for injuries
purportedly sustained in the July 19th acci-
dent. Theirs were the only injury claims
filed in connection with the accident. Medi-
cal records furnished by Katz indicated
that Osum had been treated by Dr. Lindner
on twenty occasions from July 19th to No-
vember 18th for acute lumbar sprain, that
Earl Daniels was treated by Dr. Lindner on
nineteen occasions, and that Myrna Daniels
was treated on twenty occasions. Myrna
Daniels testified at trial that she actually
visited Dr. Lindner only five or six times,
that she was told she could simply call the
doctor's office rather than appear in person
in order to be counted as having made an
office visit, and that she was prescribed
medication on one occasion but did not take
it. General Accident paid $2,875 to each of
the 3 claimants. Katz used the mails to
send a notice of the claims, and later medi-
cal reports, to the insurance company's at-
torney.

On August 3, 1985, Osum was involved
in an almost identical accident while driving
an RTA bus on Canal Street. After again
telling his RTA supervisor and RTA claims
adjuster that there were no injuries in the
accident, Osum procured Katz's assistance
in filing claims for himself and five other
persons against the car's insurer, Avis
Rent-a-Car. The claimants included
Osum's uncle (George Sterling) and Osum's
father- and mother-in-law. All claimants
were treated by Dr. Lindner. The 6 claims
were ultimately settled for a total of ap-
proximately $18,000. Osum, who claimed

to have sprained his right thumb and sustained an injury to his lower back in the August 3rd accident, was also treated by Dr. Bruce Samuels from August 8th to December 23rd, 1985. On the medical history form that Osum submitted to Dr. Samuels, he made no mention of any previous back injuries and did not indicate that he was currently receiving treatment from Dr. Lindner for a lower back injury. On December 23rd, Dr. Samuels released Osum after determining that he had no pain and that he had full movement in both his back and his thumb.

Finally, on December 7, 1985, Osum was involved in a third minor accident of the same nature between the bus he was driving and an automobile, for which attorney Katz filed claims against the car's owner, Hertz Rent–a–Car. The three claimants in this accident were Osum, Mark Sterling, and Marvin Sterling. Mark and Marvin Sterling were Osum's nephews and the sons of George Sterling, a claimant in the August 3 accident. The medical records submitted with this claim showed that Osum was treated by Dr. Lindner on twenty occasions between December 13, 1985, and April 7, 1986 for a sprained right thumb and a lower back injury, but there was no indication in the records that Osum had had any previous back or thumb injuries. The medical records indicated that one of these visits occurred on December 23rd, which according to Dr. Samuels' records from the previous accident was the same day that Dr. Samuels discharged Osum as completely recovered.

On July 13, 1990, an indictment was filed charging Osum with conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371, and with six substantive mail fraud offenses, in violation of 18 U.S.C. § 1341, all in connection with the claims filed for the July 19th accident. Under the Eastern District of Louisiana's system of random case allotment, the case was assigned to Section I, presided over by Judge Henry A. Mentz, Jr. On July 17, 1990, the government moved to transfer the case to Section G, Judge Morey L. Sear's section of the court. All previous indictments in the RTA bus frauds investigation had been transferred to Section G. Judge Sear had presided over the joint trial of Isaac Joshua and another RTA bus driver, Gloria Buckles, and had accepted guilty pleas from approximately forty other co-conspirators. The government argued that because Judge Sear was familiar with the conspiracy, transfer to his court would be "the most efficient use of judicial resources." Judge Mentz granted the motion over the opposition of defense counsel.

Also prior to trial, the government filed memoranda stating their intention to introduce evidence of the claims made by Osum and his relatives for the two subsequent accidents on August 3rd and December 7th, and of their intention to use a summary witness and charts to summarize evidence pertaining to the three bus accidents and the related insurance claims. The defense did not express any opposition to these proposals prior to trial. On the first day of trial, defense counsel objected to the introduction of evidence of claims from the two subsequent accidents. The court held that the evidence was admissible. Defense counsel did not then object to the government's use of a summary witness, although counsel successfully moved for the designated summary witness to be excluded from the courtroom except when testifying. When the government was ready to present the witness, defense counsel did object, arguing that the records were not voluminous enough to warrant his use. The court overruled the objection, noting, among other things, that defense counsel had not objected at the outset of trial, and the government had proceeded with its case in reliance on its plan to present the detailed claims information in summary form.

The jury found Osum guilty on all seven counts. The court imposed a sentence of 15 months in prison, 3 years' supervised release, and a $3,000 fine.

## Discussion

### I. Transfer of the Case

Osum argues that the justification given by the government for the transfer to

Judge Sear had no statutory basis in the Federal Rules of Criminal Procedure or the local rules of court and that, lacking a valid statutory basis, the transfer should be regarded as impermissible forum shopping. He argues that the transfer circumvented the Eastern District's random allotment system, noting that if a judge finds it necessary to recuse himself, the ordinary procedure is for the case to be reassigned through the same random process.

In response, the government draws on cases dealing with changes of venue to argue that because a defendant has no constitutional right to a trial within a particular division of a judicial district, *In re Chesson*, 897 F.2d 156, 158 (5th Cir.1990) (per curiam); *United States v. Dickie*, 775 F.2d 607, 610 (5th Cir.1985), then *a fortiori* there can be no right to a trial in a particular court section or before a particular judge.[1]

■ Although the government's argument is correct as far as it goes, the intradistrict transfer cases also establish that a court may not transfer a case, or deny a defendant's motion for transfer, if the defendant makes a strong showing that the action would be prejudicial. *See United States v. Duncan*, 919 F.2d 981, 985 (5th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2036, 114 L.Ed.2d 121 (1991). The court in those cases must balance the defendant's concerns—either extensive pretrial publicity or the inconvenience of standing trial at a different location—with the interest in the prompt administration of justice. *Dickie*, 775 F.2d at 610; Fed. R.Crim.P. 18. The trial court has broad discretion in determining whether a transfer is warranted. *See Chesson*, 897 F.2d at 159; *United States v. Kaufman*, 858 F.2d 994, 1006 (5th Cir.1988); *United States v. Weddell*, 800 F.2d 1404, 1406 (5th Cir.1986).

This Court applied a slightly different test to an alleged exercise of prosecutorial forum shopping in *United States v.*

*Williams,* 809 F.2d 1072 (5th Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 228, 98 L.Ed.2d 187 (1987). In that case, the government obtained a reassignment of the case to a different judge by dismissing the indictment and then reindicting the defendant. The second indictment was randomly assigned to a different judge. This Court observed that Federal Rule of Criminal Procedure 48(a) gives the prosecutor discretion in dismissing an indictment; therefore, the district court was obligated to grant the prosecutor's motion to dismiss the first indictment unless the court found the prosecutor was clearly motivated by considerations other than his assessment of the public interest. *Id.* at 1083–84. This Court concluded that the district court had not abused its discretion.

■ The present case is not identical to *Williams.* The alleged forum shopping here is somewhat more direct; whereas the dismissal in *Williams* only served to put the case back into the random allotment system, the transfer here put the case into the court of the government's choice. More importantly, there is no rule analogous to Federal Rule of Criminal Procedure 48(a) expressly giving the prosecution the right to a transfer of the case. Therefore, we feel that the test applied in the change-of-venue cases cited above is more appropriate; although the court is not, as in *Williams*, bound to defer to the government's request for a transfer (dismissal in *Williams*) absent a showing of illicit motivation, the transfer may be granted within the trial court's discretion unless the defendant shows that a transfer would be prejudicial. This test is supported by Federal Rule of Criminal Procedure 57, which authorizes district judges to "regulate their practice in any manner not inconsistent with these rules or those of the district in which they act."

■ Osum did not argue to Judge Mentz that the transfer would be prejudicial—

---

1. Cases from other circuits make this point more explicitly. *See, e.g., Sinito v. United States,* 750 F.2d 512, 515 (6th Cir.1984); *United States v. Braasch,* 505 F.2d 139, 147 (7th Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1562,

43 L.Ed.2d 775 (1975). Relatedly, it has been observed that a defendant does not "have the right to have his judge selected by a random draw." *Sinito,* 750 F.2d at 515.

only that it would not be economical. The only allegation that Osum makes on appeal to support his suggestion that Judge Sear was predisposed toward the government's position is that Judge Sear failed to seriously consider the prejudicial effect of admitting evidence of the two subsequent bus accidents and associated claims as evidence of extrinsic acts under Federal Rule of Evidence 404(b). As we discuss in the following section, we conclude that Judge Sear's determination that the evidence was admissible was clearly correct.[2] By contrast, the government did offer a legitimate reason for its requested transfer. In the change-of-venue cases, the existence of a valid reason for granting a transfer has served to bring the trial court's decision within the permissible range of discretion. *See Kaufman,* 858 F.2d at 1006; *Dickie,* 775 F.2d at 607. Although the transfer of a case to a different judge upon request of the government is not something we would endorse as routine practice, we cannot in this case, given the existence of a valid reason supporting transfer and no showing of prejudice by the defendant, say that the district court abused its discretion. *Cf. United States v. Ezeodo,* 748 F.2d 97, 99 (2d Cir.1984) (defendant's failure to show prejudice precluded a finding that his rights under Federal Rule of Criminal Procedure 18 were violated), *cert. denied,* 469 U.S. 1225, 105 S.Ct. 1218, 84 L.Ed.2d 359 (1985).

Osum argues that the transfer undermines the random allotment system generally followed in the Eastern District of Louisiana. He does not contend, however, that this system is enshrined in a local rule adopted under Federal Rule of Criminal Procedure 57, and we are aware of no such formal local rule.[3] The random

---

2. Moreover, Osum cannot complain of the sentence he received from Judge Sear. The conspiracy offense, because it continued after October 31, 1987, was covered by the United States Sentencing Guidelines; the six substantive counts of mail fraud (the last of which was committed in January 1987) were not. *See United States v. White,* 869 F.2d 822, 826 (5th Cir.) (per curiam), *cert. denied,* 490 U.S. 1112, 109 S.Ct. 3172, 104 L.Ed.2d 1033 (1989). The total sentence imposed (15 months' imprisonment, 3 years' supervised release, and a $3,000 fine) was within the guideline range for the conspiracy offense alone (10 to 16 months' imprisonment, 2 to 3 years' supervised release, and a $3,000 to $30,000 fine). Osum was additionally exposed to five-year sentences on the substantive counts. *See United States v. Garcia,* 903 F.2d 1022, 1025 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 364, 112 L.Ed.2d 327 (1990). *See also Sinito,* 750 F.2d at 516 (looking to the sentence imposed in deciding that an appellant was not prejudiced by the transfer of his case to a different judge).

3. Nor are we furnished with a copy of (or quotation from) any written memorialization of the random allotment system.

It is questionable whether local rules that primarily serve internal housekeeping purposes create rights enforceable by the defendant. *See Ezeodo,* 748 F.2d at 99. It is generally stated that local rules governing the assignment of cases are intended to promote efficient operation of the district courts and do not normally give defendants vested rights to any particular procedure. *Sinito,* 750 F.2d at 515; *United States v. Torbert,* 496 F.2d 154, 157 (9th Cir.), *cert. denied,* 419 U.S. 857, 95 S.Ct. 105, 42 L.Ed.2d 91 (1974). Courts have typically taken the view that, as in the change-of-venue cases, the focus remains on prejudice to the defendant. *See United States v. Gallo,* 763 F.2d 1504, 1532 (6th Cir.) (holding that a transferred defendant is not entitled to a new trial unless the transferee judge is disqualified), *modified on other grounds sub nom. United States v. Graewe,* 774 F.2d 106 (6th Cir.1985); *Ezeodo,* 748 F.2d at 99 ("[W]hatever the extent of appellant's rights under the local rules ..., in order to prevail appellant still had to make a showing of prejudice, similar to that required by Rule 18."); *United States v. DeLuca,* 692 F.2d 1277, 1281 (9th Cir. 1982) ("Even if the transfer failed to satisfy the literal terms of the local rule, it met minimum due process demands." (citation omitted)); *United States v. Simmons,* 476 F.2d 33, 35 (9th Cir.1973) ("[N]oncompliance [with court rules] per se is not the determinant but rather prejudice to the defendant.").

Although these cases present factual scenarios arguably somewhat similar to the present case, few if any squarely confront the precise allegation in this case: that a local rule (here, a local practice) was consciously abandoned to accommodate a party's desire to appear before a particular judge. *See, e.g., Sinito, supra* (confronting a claim that because of a ministerial error in the assignment of a previous case, the appellant's case was randomly assigned to a different judge than it otherwise would have been); *Ezeodo, supra* (involving a transfer challenged on the basis of inconvenience of the site of trial); *Torbert, supra* (involving a trial judge challenged for prejudice who transferred the case himself rather than returning it to the random allotment system). *But see Gallo, supra* (responding to an allegation of prosecutors "steer-

allotment system or practice would appear to serve the purposes of distributing the case load among the judges and of fostering selection of the tribunal in a neutral manner rather than at the behest of one party or the other. Certainly, the transfer in this case ran counter to the latter purpose of the system to some extent. However, it was not a complete and unchecked evasion of the system. The system assigned the case to Judge Mentz. Any variation from that assignment required the approval of Judge Mentz, plus—it seems obvious—the acquiescence of the judge to whom the case would be assigned. In other words, the government could not have altered the random assignment purely by its own choice; it was required to properly invoke the court's power to transfer by showing cause for the transfer, and Osum had the opportunity to defeat transfer by showing that he would be prejudiced. Again, although routine and *pro forma* transfers would thwart the random assignment system, nothing before us reflects, and it is not reasonable for us to assume, that the system was intended to defeat *per se* the district court's inherent power to transfer,[4] and, noting that district courts are to be afforded broad discretion in determining the requirements of even their formal local rules, *United States v. DeLuca*, 692 F.2d 1277, 1281 (9th Cir.1982); *United States v. Simmons*, 476 F.2d 33, 35 (9th Cir.1973), we hold that no violation of any provision of the random allotment system has been established. Moreover, as noted, Osum has demonstrated no prejudice. Accordingly, his complaint in this respect presents no reversible error.

## II. Admission of Evidence of Subsequent Acts

Osum next challenges the trial court's admission into evidence of the subsequent bus accidents on August 3rd and December 7th and their related insurance claims. He argues in passing that the district court failed to conduct the on-the-record, two-step analysis for the admission of extrinsic evidence prescribed in *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). However, his principal arguments are that the chief purpose and effect of the evidence was to show his bad character, rendering it inadmissible under Federal Rule of Evidence 404(b), or in the alternative that, even if admissible under an exception to Rule 404(b), the evidence was so highly prejudicial and so remotely relevant to the crime charged that this court should hold it inadmissible under Federal Rule of Evidence 403.

Rule 404(b) states:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

■ In *Beechum*, this Circuit set out a two-part test for applying Rule 404(b): a court must first determine that the evidence is relevant to an issue other than the defendant's character, and must then determine whether the evidence possesses probative value that is not substantially outweighed by its undue influence and meets the other requirements of Rule 403. *Beechum*, 582 F.2d at 911. Moreover, this Circuit has established safeguards to ensure that the trial court engages in the proper *Beechum* analysis and that this analysis is sufficiently apparent for purposes of appellate review. When requested by a party, a trial court must articulate on the record its findings as to the *Beechum* probative value/prejudice evaluation. *United States v.*

---

ing" cases to a judge of their choice); *but cf. United States v. International Bhd. of Teamsters*, 697 F.Supp. 710 (S.D.N.Y.1988) (confronting a claim that prosecutors manipulated, but technically complied with, local transfer rules in order to get the case before a particular court).

**4.** To so hold would be to accept the view that under the system a district court may not trans-

fer a case except with the consent of the accused, a contention this Circuit has rejected in a more general context as "patently frivolous." *United States v. Stone*, 411 F.2d 597, 598 (5th Cir.1969) (per curiam).

*Anderson*, 933 F.2d 1261, 1269 (5th Cir. 1991); *United States v. Robinson*, 700 F.2d 205, 213 (5th Cir.1983), *cert. denied*, 465 U.S. 1008, 104 S.Ct. 1003, 79 L.Ed.2d 235 (1984). In the absence of on-the-record findings in response to such a request, the appellate court will order a limited remand to enable the trial court to make such findings "unless the factors upon which the probative value/prejudice evaluation were [sic] made are readily apparent from the record, and there is no substantial uncertainty about the correctness of the ruling." *Robinson*, 700 F.2d at 213.

■ Here, upon Osum's counsel's objection to the government's introduction of the evidence of the subsequent accidents, Osum's counsel, the prosecutor, and the trial judge engaged in an extended discussion out of the presence of the jury as to whether the evidence satisfied Rule 404(b) as construed in *Beechum*. Initially, the trial court made the requisite finding that the evidence was relevant to an appropriate issue other than character, noting that "the relevancy is assessed by comparing the state of mind required for the past and present offenses and that's what *Beechum* teaches." When Osum's counsel made the argument that the evidence did not possess adequate probative value when measured against its prejudicial effect, the court stated: "Well, I think it does, and I just have to satisfy myself by another reading of *Beechum* here for a minute." After an 18–minute recess, Osum's counsel repeated his point that if the prejudicial effects substantially outweighed the probative value, the evidence would have to be excluded. The court responded: "That's right. If I felt that that's what it was, and I do not, I do not, okay." There was no further discussion by the court or counsel.

Osum complains that the trial court's remarks in this respect are too general.

We hold that Osum has not demonstrated reversible error in that connection. We have generally stated that a trial court is required to make "an on-the-record articulation ... of *Beechum*'s probative value/prejudice inquiry *when requested by a party*" and that a limited remand may be required "[i]n the absence of on-the-record findings *in response to such a request*." *Robinson*, 700 F.2d at 213 (emphasis added). Although it is not clear from (and certainly not expressly stated in) the opinion, in *Robinson* we may have regarded the defendant's objection as the relevant request. However, we have "subsequently implied that the defendant must make a formal request that the trial court articulate its *Beechum* findings." *United States v. Fortenberry*, 860 F.2d 628, 634 n. 11 (5th Cir.1988).[5] In *Anderson* we observed that under *Robinson* trial court *Beechum* findings are required "[w]hen requested by a party," 933 F.2d at 1269, and that the defendants objected to the evidence but did not "request on the record findings." *Id.* at 1270. However, "[e]ven though the defendants did not request *Robinson* findings," we nevertheless remanded as to one defendant because "when the admissibility of other offenses is a close question, as it is in this case, the record still must reflect that the court applied the required test under *Beechum*." *Anderson*, 933 F.2d at 1273. We observed that "[t]he district court here did not make any specific rulings on relevancy or prejudice.... Nothing in the record reflects that the court applied the *Beechum* test," *id.* at 1270, and "it is not clear from the record that the trial court conducted the requisite *Beechum* analysis." *Id.* at 1273. We concluded that "we must remand the case involving Anderson's convictions because of the uncertainty in the record." *Id.*[6]

---

**5.** In *Fortenberry*, although we discussed the inadequacy of the trial court's findings, which addressed the Rule 404(b) factors but not the Rule 403 weighing, we ultimately ourselves concluded that the extrinsic offense evidence "so dominated Fortenberry's trial that the prejudice it created 'substantially outweighed' its probative value." *Id.* at 632. *See also id.* at 630. We

further observed that "[t]he prosecutor's closing statement exacerbated the prejudice," *id.* at 634, and that the trial court's instructions were inadequate. *Id.* at 635.

**6.** In this connection we had noted that the trial court had refused to hear additional proffered evidence "relevant to the *Beechum* inquiry" that

■ We conclude from *Anderson* that an objection to the evidence does not constitute a request for *Beechum* findings. This is logical, else any requirement for such a request would be wholly superfluous for if there were no objection to the evidence reversal could only occur under the "plain error" standard, and if that standard were met the lack of request would presumably be immaterial. While *Anderson* recognizes that a remand may be required even though there was no request for *Beechum* findings, it suggests that such a result is limited to truly close cases where "nothing in the record reflects that the court applied the *Beechum* test." Here, although the evidence was objected to, there was not only no express request for the trial court to make on-the-record *Beechum* findings, but there is no doubt that the trial court expressly stated that it had applied *Beechum* balancing and concluded that the prejudicial effects did not substantially outweigh the probative value of the challenged evidence. Moreover, as noted below, we do not regard the Rule 403 issue here as a particularly close one.

In *United States v. Zabaneh,* 837 F.2d 1249 (5th Cir.1988), we seemingly regarded similar findings as too conclusory to meet the "requirement ... that the *Beechum* probative value/prejudice inquiry must be articulated on the record when requested by a party." *Id.* at 1264. But there are several relevant factors in *Zabaneh* that are not present here. To begin with, in *Zabaneh* we apparently concluded that an appropriate findings request had been made. That is not so here. Further, in *Zabaneh* that district court made no *Beechum* statement whatever as to certain items of the challenged evidence. *Zabaneh* at 1264 n. 20 and accompanying text. Again, that is not the situation here. Finally, and of particular significance, is the fact that in *Zabaneh* the record affirmatively reflected that the district court misunderstood the required *Beechum* balancing. It said it admitted the evidence because it was "would greatly assist our review," and that "the record before us is insufficient on the issue of the admissibility of evidence as to the four previous fires under Rule 404(b)." *Id.* In

"not able to say ... that ... the jury is likely to have its passions inflamed." 837 F.2d at 1264. We held that this was error because Rule 403 "is not at all limited to evidence that 'will inflame the jury's passions.'" *Id.* at 1265. The trial court "also incorrectly stated ... that any problems resulting from the admission of 404(b) evidence could be handled by cautionary or limiting instructions." *Id.* at 1264. We regarded it as "[o]f critical importance ... that the [district] court unduly restricted the scope and applicability of Rule 403." *Id.* at 1265. No such critically important factor is present here, as there is nothing to indicate that the trial court misunderstood or misapplied the *Beechum* test.

■ We conclude that a remand for further *Beechum* probative value/prejudice findings is not required at least where, as here, the following three factors are present: there is no express request for such findings; the trial court expressly states that it has made the *Beechum* probative value/prejudice weighing and finds that the prejudice does not substantially outweigh the probative value; there is nothing to indicate that the trial court misunderstood or misapplied the *Beechum* test.

■ We further note that in any event a remand is only required if the factors contributing to the probative value/prejudice determination are not evident from the record, or if there is "substantial" doubt about the correctness of the ruling. *Robinson,* 700 F.2d at 213. *See also Anderson,* 933 F.2d at 1274. We do not find that to be the case here.

■ Osum's main line of defense at trial was that he was genuinely injured in the July 19, 1985 accident and that he was unaware of the fraudulent claims by the Danielses. Therefore, his knowledge and intent regarding the claims from the July 19th accident were directly at issue, and evidence tending to prove that he knew of

*Anderson* the issue was the sufficiency of the evidence as to Anderson's connection with the previous fires.

and participated in the fraud arising from the July 19th claim would clearly be admissible under Rule 404(b). *Beechum* itself establishes that where the issue addressed is the defendant's intent, extrinsic offenses that are similar in nature are admissible because "the relevancy of the extrinsic offense derives from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses. The reasoning is that because the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense." *Beechum*, 582 F.2d at 911.

We find that reasoning to be directly applicable here. Subsequent,[7] almost identical, accidents in which Osum knowingly filed false claims and assisted his relatives in doing so make it improbable that he was an unwitting participant in the charged fraud. It is apparent from the evidence in the record that the challenged evidence was damning to Osum not because it was "prejudicial"—*i.e.*, because it created the danger that the jury would feel that Osum deserved punishment for the extrinsic offense whether or not he committed the charged offense, *id.* at 914, or because its principal probative value was to adversely reflect on Osum's character—but because it rendered unambiguous the circumstances surrounding the July 19th accident.

Implicit in this discussion is our rejection of Osum's contentions that the district court abused its discretion in determining that the evidence was relevant for the purposes authorized under the second sentence of Rule 404(b) and that its probative value for such purposes was not substantially outweighed by the danger that it would be unfairly prejudicial, confusing, or misleading. *See United States v. Harris*, 932 F.2d 1529, 1534 (5th Cir.1991); *United States v. Cordell*, 912 F.2d 769, 775 (5th Cir.1990).

### III. Sufficiency of the Evidence

Also without merit is Osum's contention that the government's evidence was insufficient to prove that he had the requisite *mens rea* for the charged offense.

A conviction for mail fraud requires proof of the defendant's specific intent to commit fraud. *United States v. Goss*, 650 F.2d 1336, 1341 (5th Cir.1981). On appeal, this court must view the evidence, direct and circumstantial, and all inferences reasonably drawn from it, in the light most favorable to the verdict, and must sustain the verdict if a rational trier of fact could have found all elements of the offense beyond a reasonable doubt. *United States v. Villasenor*, 894 F.2d 1422, 1425 (5th Cir.1990); *United States v. Molinar–Apodaca*, 889 F.2d 1417, 1423 (5th Cir. 1989).

Here, ample evidence was presented from which the jury could have rationally concluded that Osum knowingly sought to defraud the insurance companies. Myrna Daniels and Joshua both testified to Osum's knowing involvement in the scheme. Moreover, the inconsistencies between Osum's statements to RTA representatives and his statements in his insurance claims, as well as the internal inconsistencies in his claims from the three accidents, also support a finding of fraud.

The gist of Osum's argument is that because Joshua hoped for a reduction in the sentence he was then serving in exchange for testifying, and because Myrna hoped for leniency in her sentencing as a result of her testimony, and both had plea bargained with the government in return for their promised cooperation, the jury should have disregarded their testimo-

---

**7.** We also reject Osum's contention that the extrinsic offenses here were not admissible because they were subsequent to, rather than prior to, the charged offense. Osum argues that the contrary statement in *Beechum* relied upon by the district court, *Beechum*, 582 F.2d at 903 n. 1, is purely dictum and that the question remains an open one in this Circuit. In our view, the question is not as open as Osum suggests. *See United States v. Webb*, 625 F.2d 709, 710 (5th Cir.1980); *United States v. Myers*, 550 F.2d 1036, 1044 n. 10 (5th Cir.1977), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978); *United States v. Pollard*, 509 F.2d 601, 604 (5th Cir.), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975).

ny. However, the law in this Circuit as to the use of accomplice or co-conspirator testimony is clear: a conviction may be based even on uncorroborated testimony of an accomplice or of someone making a plea bargain with the government, provided that the testimony is not incredible or otherwise insubstantial on its face. *United States v. Gardea Carrasco*, 830 F.2d 41, 44 (5th Cir.1987); *United States v. Acosta*, 763 F.2d 671, 689 (5th Cir.1985); *United States v. Moreno*, 649 F.2d 309, 312 (5th Cir.1981). Moreover, the jury is the ultimate arbiter of the credibility of a witness; testimony generally should not be declared incredible as a matter of law unless it asserts facts that the witness physically could not have observed or events that could not have occurred under the laws of nature. *United States v. Lindell*, 881 F.2d 1313, 1322 (5th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990); *United States v. McKenzie*, 768 F.2d 602, 605 (5th Cir.1985), *cert. denied*, 474 U.S. 1086, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986); *United States v. Garner*, 581 F.2d 481, 485 (5th Cir.1978).

Here, the jury had before it evidence of the witnesses' interest in testifying, yet it evidently found the testimony credible.[8] The testimony was not unbelievable on its face. The jury's decision to convict Osum, based on this evidence and the evidence of Osum's own misrepresentations, was adequately supported.

## IV. Use of Summary Witness

Finally, Osum argues that the summary evidence presented by the government pursuant to Federal Rule of Evidence 1006 was vague, cumulative, and prejudicial. The government's witness synthesized various documentary information from the three accidents (RTA files, drivers' reports, supervisors' reports, claim adjustors' reports, and medical reports), all admitted into evidence independently, and categorized the evidence for the jury, including the use of summary charts.

Rule 1006 requires only that the writings or records to be examined be voluminous and that in-court examination be inconvenient. Fed.R.Evid. 1006; *United States v. Duncan*, 919 F.2d 981, 988 (5th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2036, 114 L.Ed.2d 121 (1991). We review a trial court's decision to admit testimony of a summary witness only for an abuse of discretion. *Duncan*, 919 F.2d at 988; *United States v. Stephens*, 779 F.2d 232, 239 (5th Cir.1985).

We find no abuse of discretion in this case. It was well within the trial court's discretion to conclude that to examine numerous reports from three separate accidents would be very burdensome for the jury and would be substantially facilitated by summary evidence.[9] The fact that the reports were already in evidence does not mean that in-court examination would have been convenient. *Duncan*, 919 F.2d at 988; *Stephens*, 779 F.2d at 239.

The rejection of Osum's claim that he was prejudiced by the use of the evidence is buttressed by the fact that defense counsel allowed the trial to proceed up until the point where the summary witness was called before objecting, despite notice by the government well in advance of trial that it planned to use a summary witness.

## Conclusion

Because we find all of Osum's claims on appeal to be ultimately unavailing to estab-

---

**8.** The trial court instructed the jury, *inter alia*, that the "testimony of an alleged accomplice and ... of one who provides evidence ... for immunity from punishment or for personal advantage ... must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses."

**9.** The court instructed the jury (without objection here or below) that the summaries were not themselves evidence and that the jury "must ask yourselves whether these summaries com-

port with the evidence admitted" and must "disregard any summary that is not supported by the evidence admitted into the record." We note that summaries or the like introduced under Rule 1006 may in appropriate circumstances be evidence themselves; in such an instance, this sort of instruction may improperly prejudice the party introducing the summaries, at least if the underlying documents are not in evidence.

lish reversible error, the judgment of the district court is

AFFIRMED.